In re STRAUSS et al., Board of Water Supply.

In re ADDITION TO CITY AQUEDUCT DEPARTMENT, SECTION NO. 1.

(Supreme Court, Appellate Division, Second Department. April 23, 1915.)

1. EMINENT DOMAIN ☞186—PROCEEDINGS—CONDEMNATION.
     Laws 1905, c. 723, creating the state water supply commission, provides in section 3 that municipal applications for leave to take additional sources of water supply are to be accompanied by maps showing the sites and areas of the proposed reservoirs. The section also provides for a finding by the commission of a public necessity for the taking and whether the plans are just to other municipalities and civil divisions affected. The City Water Supply Act (Laws 1905, c. 724) provides in section 46 that, before the taking of reservoirs and sources, maps and plans covering the work shall be approved by the state water supply commission. Section 3 provides, not only for the filing of plans showing municipal needs, but also for maps showing where the water is to be impounded; and section 5 provides for maps showing the land through which proposed aqueducts will run, while section 7 authorizes the city board of water supply to have such maps adopted by the board of estimate and to transmit them to the corporation counsel. *Held* that, as the two acts should be construed together, the general act does not require the filing with and approval by the state commission of maps showing the eventual distribution of water through the several subdivisions of the city.
     [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 500–504; Dec. Dig. ☞186.]

2. EMINENT DOMAIN ☞170—PROCEEDINGS—CONDITION PRECEDENT.
     Where a city sought to condemn a perpetual underground easement through land on which a dock company had erected a spur track, an adjacent railroad company interested in the shore line could not claim that the application must be denied, unless the city alleged and showed that it had been unable to agree with the railroad company upon compensation for its loss, for Laws 1905, c. 724, § 13, providing for the assessment of loss, direct or consequential, to steam railroads by reason of the location of aqueducts, was enacted to protect a railroad company which had to relocate its right of way, and not for the benefit of railroad companies which owned no interest in the land affected.
     [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 462–467; Dec. Dig. ☞170.]

Appeal from Special Term, Richmond County.

In the matter of the application and petition of Charles Strauss and others, constituting the Board of Water Supply, to acquire a perpetual underground easement. From an order denying an application for the appointment of commissioners of appraisal, the City of New York appeals. Order reversed.

The city of New York, by its board of water supply, in 1906 had prepared a map and profile of its Catskill Aqueduct system, extending from various reservoirs as proposed in the counties of Ulster, Sullivan, Greene, and Schoharie, and leading under the Hudson river to the city of New York, whence be-

neath the East River it entered the borough of Brooklyn, and finally passed under the Narrows at Bay Ridge, to Staten Island. On May 14, 1906, the map and this aqueduct plan received the official approval of the state water supply commission. It was thereafter formally accepted by the city board of estimate and apportionment. Subsequently, in 1912, the city without resorting to condemnation, acquired an easement of approach at Staten Island, extending inland from the pierhead line, to lead a submerged water pipe to form a connection with the system of Richmond water mains. Before construction had reached this submarine line, the fee of this water front land, subject to this easement, was acquired by the adjoining dock company, on which, under a city permit, the dock company has erected a stone crib, pile platforms, with a spur track, all located close to the situs of this water pipe easement.

The plans for crossing New York Harbor involve a submarine excavation by dredging out a trench in which is to be laid a flexible water pipe with caulked joints, after which the trench is to be filled and covered over. In approaching the shore, the excavation was to be at a depth of over 20 feet. The added risk of such deep excavation so near this cribwork and other recent structures led the engineers of the board of water supply to shift the location of the trench about 50 feet further away from this crib. This involved a new plan, and an amended condemnation map of the land to be taken, showing also the temporary easements sought in connection therewith. This map, having been approved by the board of estimate and apportionment and certified to the corporation counsel, was made the basis of a condemnation proceeding. The Staten Island Rapid Transit Company and the New York Transit & Terminal Company, as interested in this shore front, appeared and objected to the appointment of commissioners of appraisal. After hearing and taking testimony, the Court at Special Term denied the city's application. The city of New York, and the board of water supply of the city of New York, on behalf of the city of New York, have appealed therefrom to this court.

Argued before JENKS, P. J., and BURR, CARR, RICH, and PUTNAM, JJ.

Charles J. Nehrbas, of New York City (Terence Farley and Henry W. Mayo, both of New York City, on the brief), for appellant.

Marvin W. Wynne, of New York City (Nicholas Kelley, of New York City, on the brief), for respondents.

PUTNAM, J. The learned court at Special Term sustained the objection by the defending owners that the condemnation map of the particular water front had not been submitted for approval to the state water supply commission.

[1] The act for creation of the state water supply commission (Laws of 1905, c. 723), and that for the New York City water supply (Laws of 1905, c. 724), as contemporaneous acts, are to be read together. Matter of Board of Water Supply, 211 N. Y. 174, 181, 105 N. E. 213. In connection with granting such right to municipalities, the state created a central commission to regulate taking interior sources of water supply. Municipal applications for leave to take such new or additional sources are to be—

"accompanied by an exhibit of maps of the lands to be acquired and profiles thereof showing the sites and areas of the proposed reservoirs and other works, the profiles of the aqueduct lines and the flow lines of the water when impounded, plans and surveys and abstract of official reports relating to the same, showing the need of such municipal corporation for a particular source or sources of supply and the reasons therefor, and shall be accompanied by a plan or scheme to determine and provide for the payment of the proper com-

pensation for any and all damages to persons or property, whether direct or indirect, which will result from the acquiring of said lands and the execution of said plans." Laws 1905, chap. 723, § 3.

After public hearing this state commission was to determine if the plans "are justified by public necessity, and whether such plans are just and equitable to the other municipalities and civil divisions of the state affected thereby and to the inhabitants thereof"; also if they make "fair and equitable provisions for the determination and payment of any and all" resulting damages. Section 3.

The City Water Supply Act had a final clause that, before such taking, the "maps and plans covering the work contemplated by this act" should be approved by the state water supply commission. Laws 1905, chap. 724, § 46. Plainly this local act did not thereby add to the requirements for such applications to the state commission already laid down in the preceding chapter. The "maps and plans covering the work" meant the exhibit of maps and profiles already prescribed by section 3 of the State Water Commission Act.

The City Water Supply Act provides for two sets of maps and plans. After satisfying the requirements of the State Commission Act by reports showing municipal needs, it is to present to the state commission maps showing territory where the water is to be impounded in a reservoir, the site of the works proposed, also, as the water leaves the reservoir, the aqueduct lines and the flow lines. Obviously these all relate to the *sources,* as distinguished from the eventual distribution within the different wards or divisions of the municipality. The record here shows that the plan and layout of this water supply system approved by the state water supply commission indicated two parallel lines running under New York Bay from Bay Ridge to Staten Island, where presumably these aqueduct branches were to feed into the system of Richmond local water mains.

The state commission, as judges of the sufficiency of the maps and plans exhibited, doubtless might have demanded more detailed plans, or that this aqueduct be projected on a different scale; but its unqualified approval determined the adequacy of the plan, as covering the work contemplated for the purposes of these statutes. But, besides these maps and plans for the state authorities, the board of estimate and apportionment is to consider plans and surveys under section 3 of the City Act, which are to be followed by detailed maps, in sets of six, on which are to be "laid out and numbered the various parcels of real estate on, over or through which the same are to be constructed and maintained." Section 5.

When the city board of water supply have had these maps adopted by the board of estimate and apportionment, they are to transmit them so certified to the corporation counsel, who then is to give the usual notice (section 7) and to make application for the appointment of commissioners of appraisal. This excludes any idea that, after the board of estimate and apportionment has acted, these acquisition maps are to be further submitted to the state commission. Such submission of condemnation maps to the state water commission has not been had in the course of official procedure hitherto in the many condemnations taken under this act. Practical official construction and

statutory interpretation are therefore in accord with considerations of practical efficiency, in the conclusion that such submission is not required after the general plan, maps, and profiles have been approved by the state water commission.

[2] It was, however, urged that under Laws of 1905, c. 724, § 13, this petitioner must allege and show that it had been unable to agree with the railroad company upon its compensation for its loss. The language here is permissive, rather than mandatory. It relates to "loss, damage or expense, direct or consequential," resulting to a steam railroad in any county in which land shall be acquired. This refers to losses beyond the land condemned, being any resulting interference with the railroad traffic. This provision for such indirect damages to a steam railroad came in by an amendment to section 13, introduced in the assembly on March 29, 1905. Assembly Journals, p. 1629. Its purpose seems to have been to protect the interests of the Ulster & Delaware Railroad Company, whose tracks and stations had to be relocated. It was further provided that, if no agreement should be reached, "the commissioners of appraisal appointed to estimate damages for lands acquired in such county" are directed "to pass upon such claim and to make awards therefor as provided in this act." See Laws of 1906, c. 314, § 3.

The amended provisions of section 13, therefore, have no relation to this defending railroad, since the water front lands to be now taken are neither part of its right of way nor appurtenant thereto. Defendants' other objections were rightly rejected by the learned justice at Special Term.

The order appealed from should therefore be reversed, with $10 costs and disbursements, and the motion for the appointment of commissioners of appraisal granted. · All concur.